## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 28 2020, 6:23 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William Elliott Happel
Thomasson, Thomasson, Long &
Guthrie, P.C.
Columbus, Indiana

ATTORNEY FOR APPELLEE

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of K.B. & B.K. (Minor Children)<br><br>and<br><br>T.K. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner.* | May 28, 2020<br><br>Court of Appeals Case No.<br>19A-JT-2965<br><br>Appeal from the Bartholomew Circuit Court<br><br>The Honorable Kelly S. Benjamin, Judge<br>The Honorable Heather M. Mollo, Magistrate<br><br>Trial Court Cause Nos.<br>03C01-1809-JT-5148<br>03C01-1809-JT-5149 |

**Bradford, Chief Judge.**

# Case Summary

[1] T.K. ("Mother") is the biological mother of B.K. and K.B. (collectively, "the Children").[1] The Department of Child Services ("DCS") became involved with Mother and the Children due to concerns of drug use by Mother. The Children were removed from Mother's care on August 25, 2017. Three days later, the Children were alleged to be children in need of services ("CHINS"). Mother subsequently admitted that the Children were CHINS and the juvenile court adjudged them as such. Following the CHINS adjudication, Mother was ordered to complete certain services, but failed to do so. In light of Mother's failure to successfully complete services, DCS eventually petitioned to terminate her parental rights to the Children. Following an evidentiary hearing, the juvenile court granted DCS's termination petition. On appeal, Mother contends that (1) DCS failed to present sufficient evidence to support the termination of her parental rights and (2) she was denied due process. Concluding otherwise, we affirm.

# Facts and Procedural History

[2] Mother is the biological mother of the Children. K.B. was born on October 2, 2012. B.K. was born on July 3, 2017. DCS became involved with Mother and the Children on or about July 3, 2017, after receiving reports that the Children

---

[1] The Children are alleged to have different biological fathers, neither of which participates in this appeal.

were the victims of neglect and that B.K. had been born drug exposed. Mother subsequently admitted that she and B.K.'s alleged father smoked marijuana every night after the Children were put to bed. Mother submitted to a drug screen and tested positive for THC and cocaine. Despite Mother's positive drug screen, the Children remained in Mother's care. DCS received another report regarding the Children on or about August 19, 2017. This report alleged that K.B.'s alleged father had overdosed on heroin in Mother's home after spending the night. Mother admitted to getting her marijuana from K.B.'s alleged father and that the marijuana was, on occasion, laced with heroin. Mother submitted to a drug screen, the results of which were positive for THC and Fentanyl.

[3]     DCS removed the Children from Mother's care on August 25, 2017, and filed a petition alleging that the Children were CHINS on August 28, 2017. Mother subsequently admitted that the Children were CHINS and that she and the Children "would benefit from their participation in services proved by DCS that they would not otherwise be able to receive without coercive intervention of the Court." Petitioner's Ex. 5. On December 17, 2017, the juvenile court, noting Mother's admission, adjudged the Children to be CHINS and entered a dispositional decree. In its decree, the juvenile court noted that Mother reached an agreement with DCS as to needed services. The essential terms required Mother to complete certain services including therapy, home-based case management, and a substance-abuse assessment. Mother was also ordered to refrain from using illegal drugs and to submit to random drug screens as requested by DCS. The Children's permanency plan was subsequently changed

to adoption after Mother failed to successfully complete the agreed-upon court-ordered services.

[4] On September 24, 2018, DCS filed petitions to terminate Mother's parental rights to the Children. The juvenile court conducted an evidentiary hearing on January 22, 2019. During this hearing, DCS presented evidence outlining Mother's failure to comply with services, remain drug free, and make any significant progress in improving her ability to provide the necessary care for the Children. Following the conclusion of the evidence, the juvenile court took the matter under advisement. On November 15, 2019, the juvenile court issued an order terminating Mother's parental rights to the Children.

# Discussion and Decision

[5] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights, therefore, are not absolute and must be subordinated to the best interests of the children. *Id.* Termination of parental rights is proper where the children's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the children are

irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent–child relationship. *Id.*

[6] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[7] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

# I. Sufficiency of the Evidence

[8] Mother contends that the evidence is insufficient to sustain the termination of her parental rights to the Children. In order to support the termination of

Mother's parental rights to the Children, DCS was required to prove, *inter alia*, the following:

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2). Mother claims that DCS failed to present sufficient evidence to establish the statutory requirements by clear and convincing evidence.[2]

## A. Indiana Code Section 31-35-2-4(b)(2)(B)

[9] It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find that one of the conditions listed therein has been met. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines that one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for

---

[2] Mother does not challenge the statutory requirements set forth in subsections (A) or (D).

DCS to prove, or for the juvenile court to find, either of the other factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See In re S.P.H.*, 806 N.E.2d at 882. In this case, DCS had to prove either that (1) the conditions resulting in removal from or continued placement outside Mother's home will not be remedied or (2) the continuation of the parent–child relationship poses a threat to the Children.

[10] The juvenile court determined that the evidence established a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside Mother's care would not be remedied. When making a determination as to whether the conditions leading to placement outside a parent's care are likely to be remedied, juvenile courts "should judge a parent's fitness at the time of the termination hearing, considering any change in conditions since the removal." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). "The trial court can also consider the parent's response to the services offered through the DCS." *Id.* "'A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change.'" *Id.* (quoting *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*).

[11] The juvenile court made numerous findings in support of its determination that the evidence established a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside

Mother's care would not be remedied. Mother does not challenge any of the juvenile court's findings, which are consistent with the testimony and recommendations of service providers, the DCS Family Case Manager ("FCM") assigned to the family's case, and the Children's guardian ad litem ("GAL"). We will therefore accept the juvenile court's findings as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (providing that unchallenged findings of the trial court must be accepted as correct).

[12] The juvenile court's findings establish that the Children were removed from Mother's care due to Mother's drug use and the drug use of others at Mother's home. After the Children were removed from her care, Mother was ordered, *inter alia*, to: (1) complete a substance-abuse assessment and participate in the recommended treatment; (2) participate in home-based case management, which would include employment and behavior management assistance; (3) participate in individual counseling; (4) attend supervised visits with the Children; (5) maintain weekly contact with DCS; and (6) refrain from using illegal substances.

[13] The juvenile court found that although Mother completed a substance-abuse evaluation, she did not successfully complete recommended treatment. Further, although Mother achieved a temporary period of sobriety, she relapsed and continued to test positive for drugs throughout the CHINS and TPR proceedings. Mother attributed her drug use to her claimed mental illness but failed to complete any psychological or mental-health treatment programs offered to her. She did not complete a psychological evaluation aimed at

determining appropriate services to help meet her mental-health needs. She also failed to successfully meet any home-based case management goals.

[14] The juvenile court further found that Mother was not consistent in visiting the Children and provided "no reasonable excuse for the inconsistency." Appellant's App. Vol. II p. 15. Despite the flexibility offered by means of their placement in relative care, Mother last visited the Children in May of 2018. Further, despite having knowledge of K.B.'s special needs, Mother did not inquire about K.B.'s progress or, apart from allegedly obtaining a sign-language dictionary, seek training aimed to help her communicate with K.B. When asked during the evidentiary hearing why she has not reached out to K.B.'s school regarding his educational progress and needs, Mother responded as follows:

> I honestly don't have a reason. My to do list is a mile long, and I'm trying to put my kids last by no means … I know what needs to be done in certain areas, like calling the school maybe, being one of those things … I'm working on trying to, how do I put it, put my priorities in what comes first and what comes last.

Tr. Vol. II p. 149.

[15] Mother admitted that she had multiple periods of incarceration during pendency of the CHINS case and that at the time of the evidentiary hearing, she was "on probation, with a few more months left of supervision." Appellant's App. Vol. II p. 17. Mother was not employed or actively seeking employment and was living with her mother. Mother also did not engage in regular

communication with DCS or service providers. Further, despite claiming that she "has struggled in figuring out what to do first in order to move forward," Mother failed to participate in services and canceled meetings aimed at helping her do so. Appellant's App. Vol. II p. 17.

[16] Mother admitted that the Children "are better off in the homes they are in" and that "she needs the Children more than they need her." Appellant's App. Vol. II p. 18. In finding that there was a reasonable probability that the conditions leading to the Children's removal from Mother's care would not be remedied, the juvenile court noted that although Mother "may love the Children and now fears losing" them, Mother has been unable to make the Children "a sufficient priority for reunification" and "drugs, jail, a lack of motivation, and perhaps a dose of self-pity, have prevented [Mother] from making any real progress with needed change." Appellant's App. Vol. II p. 19. The juvenile court's unchallenged findings are sufficient to support the conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from Mother's care would not be remedied. Mother's claim to the contrary amounts to nothing more than an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## B. Indiana Code Section 31-35-2-4(b)(2)(C)

[17] We are mindful that in considering whether termination of parental rights is in the best interests of the children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App.

2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang*, 861 N.E.2d at 373. Furthermore, this court has previously determined that the testimony of the case worker, GAL, or a CASA regarding the children's bests interests supports a finding that termination is in the children's best interests. *Id.* at 374; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[18] The juvenile court found that termination of Mother's parental rights was in the Children's best interests. As for the Children, collectively, the juvenile court found that Mother has not "demonstrated a sufficient level of concern for the well-being of the Children." Appellant's App. Vol. II p. 19. The juvenile court further found that in Mother's absence, the Children "look to their paternal grandparents for love, support, and security." Appellant's App. Vol. II p. 19.

[19] With respect to K.B., the juvenile court found that K.B. has made significant progress since his special needs were addressed by paternal grandmother. His troubling and self-harming behaviors have stopped. In addition, his communication has improved since being enrolled at the Indiana School for the Deaf and placed in a home that embraces the use of sign language as a means to communicate. The juvenile court noted that after being placed with paternal grandmother, in the span of less than one year, K.B. "is almost up to age level with his communication skills." Appellant's App. Vol. II p. 17. As of the time

of the evidentiary hearing, K.B.'s ability to communicate with others had improved to a level where he was able to participate in therapeutic work. The juvenile court further noted that service providers have observed that K.B. and paternal grandmother have an affectionate relationship. Paternal grandmother is actively involved in K.B.'s progress and regularly communicates with his teachers in an effort to learn how to better communicate with him. Mother, on the other hand, has largely failed to show an interest in K.B.'s progress or inquire about his well-being.

[20] As for B.K., the juvenile court found that B.K. "is happy and healthy, with no developmental concerns." Appellant's App. Vol. II p. 19. B.K. has a strong bond with paternal grandparents and it is "unlikely" that B.K. "would know Mother … as he was approximately ten months old at the time of [her] last visit." Appellant's App. Vol. II p. 19. The juvenile court noted that Mother "has never contacted paternal grandparents to inquire of the well-being of" B.K. Appellant's App. Vol. II p. 19. Again, because Mother does not challenge any of the juvenile court's findings, we accept the findings as true. *See Madlem*, 592 N.E.2d at 687 (providing that unchallenged findings of the trial court must be accepted as correct).

[21] Further, in addition to the juvenile court's unchallenged findings, FCM Sarah Palacios opined that termination of Mother's parental rights is in Children's best interests. FCM Palacios explained the reasons behind her opinion, stating as follows:

I think that now is a crucial time for this to happen because [K.B.] is really starting to grow and develop in his own, and with his new culture that he's created at [the Indiana School for the Deaf] and with [paternal grandmother] at her home, he has become just a different kid. I mean from seeing him two years ago 'til now, the, the difference is astounding and the fact that he feels so loved and so cared for is very, very important to his well[-]being and his health. And the same for [B.K.]. [B.K.] has always been loved and he's always been care[d] for, but with [paternal grandparents], I mean, he's just, he's done so great and he's learned so much, and I think that introducing [Mother] back into his life would really be harmful for him and all the progress that he's made.

Tr. Vol. II pp. 131–32.

[22] The Children's GAL, Emily Yardy, also opined that termination of Mother's parental rights to the Children was in the Children's best interests. GAL Yardy explained the reasons behind her opinion, stating as follows:

So this case has had a permanency plan of adoption since July of 2018. I think the Court and the team have been very transparent with [Mother] that coming to a termination was a very real likelihood should [her] lack of engagement not change. I do not feel that [Mother has] shown an urgency in completing case plan goals, nor [has she] shown any desire to live a child[-]focused life. Which is a huge concern for me as the [GAL]. And I don't feel [Mother] has been an active member of the treatment team, or even just the team, not only for [her] own services, but to identify services for the children. And I heard earlier that there were issues with [Mother] feeling that there weren't, there's not a good fit in services for her, but the Department specifically put in a psychological evaluation referral to figure out services that would be a great fit for her. So I feel like not taking advantage of that referral could have been detrimental to her as well, in

multiple ways I guess, but just in specifically getting treatments and services that would be tailored to [Mother]. And I just think that the children are doing great in their placements. [B.K.] has no knowledge of his Mother. I think that he would probably be able to go the rest of his life, if no one told him, he would think that [paternal grandparents] are his biological parents. When I came onto the case, there were a lot of issues with [K.B.] being, I guess kind of traumatized because of the lack of contact that he was having, specifically with [Mother]. He was wild and he at one point thought that he saw her, and it was a major issue. He was hurting people, hurting himself, throwing himself on the ground, crying and screaming. It was a huge full[-]blown tantrum, and it was really hard for [paternal grandmother] to manage that, and that had kind of been an ongoing issue. Where he was asking about Mom at first, and was obviously hurt when you would, when people would tell him that she's not coming, or she's not visiting. But we have really seen such a decrease in those behaviors, and I feel like [K.B.] is finally stabilized and able to move on without [Mother].

Tr. Vol. II pp. 139 – 40. GAL Yardy further explained as follows:

Yeah, the kids are doing great. I actually came on the case at a really critical time for [K.B.]. So I was able to see those serious behaviors that he was having. The disruptive, harmful, even kind of self[-]harm behaviors that he was having. So it's been really wonderful to see him transition into someone who can just be calm and communicate his wants and needs, and just with all the testimony that we've said today, I totally agree that I think it's all because he's able to communicate now, and he doesn't feel like he has to be aggressive to get what he wants. It's been really, really wonderful to see that. For [B.K.], I don't think any of on [sic] the team have had any significant concerns for [B.K.]. He's doing great in his placement as well.

Tr. Vol. II p. 137. Considering the juvenile court's unchallenged findings together with FCM Palacios's and GAL Yardy's testimony, we conclude that the juvenile court's determination that termination of Mother's parental rights is in the Children's best interests is supported by sufficient evidence. Again, Mother's claim to the contrary amounts to nothing more than an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## II. Mother's Due Process Claims

[23] Mother alternatively contends that she was denied due process because DCS did not make reasonable efforts to reunify the Children with her. (Appellant's Br. p. 20) DCS asserts that Mother has waived her due-process argument on appeal because she did not raise it before the trial court. (Appellee's Br. p. 30) "[A] party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal." *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016); *see also Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal."); *McBride*, 798 N.E.2d at 194–95 (providing that the mother waived her procedural due process claims by raising them for the first time on appeal). At the evidentiary hearing, Mother outlined some alleged communication issues she claimed to have with DCS during the underlying CHINS and TPR proceedings and asserted that she did not believe that the services offered by DCS were helpful to her. However, our review of

the record reveals that Mother never objected to the termination on the basis that DCS failed to make reasonable efforts to provide her with services aimed at reunification. As such, Mother's due process argument is waived on appeal.

[24] Waiver notwithstanding, we conclude that Mother's due process argument is without merit. Indiana Code section 31-34-21-5.5 provides that after a child is found to be a CHINS, DCS "shall make reasonable efforts to preserve and reunify families." In this case, DCS made reasonable efforts to do so. The record reveals that DCS offered Mother extensive services and made numerous unsuccessful attempts to contact Mother during the pendency of both the CHINS and TPR proceedings. Mother, herself, testified during the evidentiary hearing that she believed that DCS had made reasonable efforts to reunite her with the Children. Specifically, when asked if she believed DCS had done everything it could to reunite her with the Children, Mother responded as follows:

> Absolutely. They gave me their best plan and tried to put their best foot forward. And I just disagree with how the system is set up. Because I feel like it's unfair to the parents. I'm grateful, so grateful that my kids have all this support and are loved and in a great place and well taken care of. And I am, I am very aware of that, that they are benefiting from where they are at, greatly. And I am happy about it, but it's not fair to the parents that sometimes we all are expected to do the same things, when our recovery isn't the same. I am not like every other parent that walks in here, just like they're not like me. So why should I have to do the same plan? Sometimes it works for some, sometimes it doesn't work for others. And I feel like it's nobody's fault, I just feel like there should be a better program or something set up for

parents. Somebody to help support them a little more, and less in some other things, because it is overwhelming when you are trying to fix your own personal affairs plus what DCS wants you, is asking of you, and then also my own legal trouble with Probation, trying to meet their quota as well. Everybody is pulling you in five different directions, it's hard to do what everybody wants at once.

Tr. Vol. II p. 153. When pressed further about whether she believed that there were services that were not offered by DCS that could have been beneficial to her, Mother responded:

Yes. But I don't think it's something that they could have come up with either. It's not their fault. I am not blaming anyone, I just found what works for me and started to go with it, tried a bunch of different things, and honestly it gets down to what they say at NA and AA meetings, you have to change your people, places and things…. I truly took a huge step to look and identify what I needed to do, and I'm taking the steps to fix it. It's just not in the time frame that was asked.

Tr. Vol. II p. 154. Mother admitted, however, that she had been given enough time to participate in the offered services.

[25] In raising her contention that DCS failed to make reasonable efforts to reunify her with the Children, Mother asserts that a case worker discouraged her and suggested that she was "headed down the wrong path" and another "failed to make reasonable efforts to get in touch with" her. Appellant's Br. p. 21. Mother relies on her self-serving testimony in support of her assertion that she was discouraged in her attempt to make progress toward reunification by a case

worker.  The juvenile court, acting as the trier-of-fact, was not required to believe Mother's self-serving testimony.  *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) ("As a general rule, factfinders are not required to believe a witness's testimony even when it is uncontradicted.").

[26] With respect to Mother's claimed communication issues with DCS and service providers, Mother acknowledged that "it's a two[-]way street on communication."  Tr. Vol. II p. 57.  Mother further acknowledged that she had spoken to FCM Palacios "a couple of times" but expressed frustration that she had "tried to reach out a couple of times and not got returned phone calls."  Tr. Vol. II p. 57.  Mother also acknowledged that at some point, she experienced issues with her phone and lost contact information for service providers and K.B.'s teacher.  Mother did not reach out to DCS to re-obtain the lost contact information.  Mother also indicated that due to her issues with her phone, she had to change her email address and was not sure if she provided FCM Palacios with her new email address.  Mother relies on her self-serving testimony in support of her claim that DCS failed to make reasonable attempts to communicate with her throughout the pendency of the CHINS and TPR proceedings.  Again, the juvenile court was not required to believe Mother's testimony.  *See Thompson*, 804 N.E.2d at 1149.

# Conclusion

[27] DCS presented sufficient evidence to prove both that there is a reasonable probability that the conditions that resulted in the Children's removal from and

continued placement outside Mother's care will not be remedied and that termination of Mother's parental rights is in the Children's best interests. Furthermore, contrary to Mother's claim, the record reveals that DCS made reasonable efforts to reunify her with the Children. We therefore conclude that Mother has failed to establish that she was denied due process in relation to the termination of her parental rights to the Children.

[28] The judgment of the juvenile court is affirmed.

Baker, J., and Pyle, J., concur.